**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Case No. 23-CR-390-RMR

UNITED STATES OF AMERICA,

       Plaintiff,

v.

1.     LARRY E. CONNER,
2.     TIMOTHY A. MCPHEE,
3.     MARCIA G. PREDMORE,
4.     RODERICK A. PRESCOTT,
5.     SUZANNE B. THOMPSON, and
6.     WELDON W. WULSTEIN,

       Defendants.

---

**SUPERSEDING INDICTMENT**

---

The Grand Jury charges:

**<u>INTRODUCTION</u>**

At all times relevant to this Indictment:

**The Defendants and Their Entities**

1.     Defendant LARRY E. CONNER ("CONNER") was a United States ("U.S.") citizen residing in the state of Kansas and in Frisco, Texas.

2.     From at least in or around 2016 and continuing until in or around September 2023, CONNER promoted and sold purported tax-mitigation strategies to U.S. taxpayers in the name of THE BUSINESS SOLUTIONS GROUP ("TBSG"). CONNER operated TBSG primarily from his residence in Frisco, Texas. CONNER held TBSG out as a trade name ("doing business as" or "d/b/a") for a purported trust he created in or around 2011

called EDEN GREEN TRUST.

3.      Defendants TIMOTHY A. MCPHEE ("MCPHEE") and MARCIA G. PREDMORE ("PREDMORE") were U.S. citizens residing in Estes Park, Colorado. MCPHEE and PREDMORE were married.

4.      From in or around October 1997 and continuing until in or around at least September 2023, MCPHEE owned and operated COMANCHE STREET PROPERTIES LLC.

5.      From at least in or around November 1997 continuing until in or around December 2021, COMANCHE STREET PROPERTIES LLC owned the property located at 950 Comanche Street in Estes Park, Colorado (the "Comanche Street Property").

6.      From in or around June 2000, until at least on or about December 31, 2018, MCPHEE owned and operated PROTECH PLUMBING & HEATING, INC. ("PROTECH").

7.      From in or around May 2011 and continuing until at least in or around September 2023, MCPHEE owned and operated MDH LTD LLC ("MDH LTD").

8.      From at least in or around 2016 and continuing until at least in or around September 2016, MCPHEE and PREDMORE owned and operated MOUNTAIN SOLITUDE LLC.

9.      From in or around February 2016, until at least on or about April 7, 2020, MCPHEE owned and operated 6307 ASH RAYTOWN LLC ("ASH RAYTOWN LLC").

10.     In or around March 2016, MCPHEE purchased the property located at 6307 Ash Street in Raytown, Missouri (the "Ash Street Property") in the name of ASH RAYTOWN LLC.

11.     From at least in or around January 2017 and continuing until in or around

September 2023, MCPHEE and PREDMORE co-owned and operated a business called PRIVATE BANKING CONCEPTS ("PBC") through which they promoted and sold purported financial and tax-mitigation strategies to U.S. taxpayers. MCPHEE registered PBC as a trademark of MOUNTAIN SOLITUDE LLC, and MCPHEE and PREDMORE operated PBC primarily from their residence in Estes Park, Colorado.

12.    Defendant RODERICK A. PRESCOTT ("PRESCOTT") was a U.S. citizen residing in California and Nevada.

13.    On or about June 2, 2003, PRESCOTT consented to be permanently enjoined—individually and doing business through any entity, their representatives, agents, servants, employees, attorneys, and those persons in active concert or participation with them—from directly or indirectly (1) organizing, promoting, marketing, or selling purported non-grantor trusts, sometimes referred to as business, family, or holding trusts, and any other abusive tax shelter, plan, or arrangement which advises or encourages customers to attempt to violate the internal revenue laws or unlawfully evade the assessment or collection of their federal tax liabilities; and (2) organizing, selling, or assisting in the organization of an entity or otherwise promoting any plan or arrangement based upon the following representations, among others: (a) the false representation that customers may continue to control and receive the beneficial enjoyment from assets irrevocably transferred to trust without regard to the grantor trust rules provided by the Internal Revenue Code, (b) the false representation that maintenance and upkeep on a personal residence can be fully deducted by a trust for the purpose of improperly avoiding taxes, and (c) the false representation that other personal expenses incurred by customers can be paid though a trust in order to improperly obtain tax benefits not

available to individuals.

14.     From at least in or around 2006 until at least in or around September 2023, PRESCOTT owned and operated THE STEWARDSHIP INSTITUTE ("TSI"), which promoted and sold purported "private family foundations" to U.S. taxpayers nationwide.

15.     From at least in or around May 2021 until at least in or around September 2023, PRESCOTT owned and controlled a purported charitable organization called OPEN ROAD FOUNDATION.

16.     Defendant SUZANNE B. THOMPSON ("THOMPSON") was a U.S. citizen residing in Kalispell, Montana.

17.     From at least in or around 2016 until at least in or around September 2023, THOMPSON owned and operated THE CFO AGENCY, LLC ("CFO AGENCY"), which offered bookkeeping and accounting services to clients nationwide for a fee from offices located in Kalispell, Montana and Cheyenne, Wyoming.

18.     Defendant WELDON W. WULSTEIN ("WULSTEIN") was a U.S. citizen residing in Gardnerville, Nevada.

19.     From at least in or around 2012 until at least in or around September 2023, WULSTEIN was the majority owner of and operated WULSTEIN FINANCIAL SERVICES & COMPANY, INC. ("WULSTEIN FINANCIAL SERVICES"), which provided tax return preparation services to clients for a fee from offices located in Gardnerville, Nevada and South Lake Tahoe, California.

20.     From in or around January 2020 until at least in or around September 2023, THOMPSON and WULSTEIN co-owned and operated a business called CONCIERGE ACCTNCY CORPORATION ("CONCIERGE ACCOUNTANCY"), through which

THOMPSON and WULSTEIN jointly offered CFO AGENCY's bookkeeping services and WULSTEIN FINANCIAL SERVICE's tax return preparation services to clients nationwide for a fee.

### Tax Terms, Forms, and Schedules

21.    The Internal Revenue Service ("IRS") was an agency of the U.S. Department of the Treasury responsible for enforcing and administering the tax laws of the U.S. and collecting taxes owed to the U.S. Department of the Treasury.

22.    IRS Form 1040, U.S. Individual Income Tax Return ("Form 1040") was used by some U.S. taxpayers to file an annual income tax return.

23.    Schedule E, Supplemental Income and Loss ("Schedule E") was an IRS form that was attached to a Form 1040, when applicable, and used by taxpayers to report income or loss generated from certain businesses, including LLCs, partnerships, and S Corporations.

24.    IRS Form 1065, U.S. Return of Partnership Income ("Form 1065") was used by partnerships to file an annual income tax return. Under the Internal Revenue Code and associated regulations, a domestic LLC with at least two members (a "multi-member LLC") was classified as a partnership for federal income tax purposes unless it elected to be treated as a corporation.

25.    IRS Form 1120-S, U.S. Income Tax Return for an S Corporation ("Form 1120-S") was used by businesses that elected to be treated as an S Corporation to file an annual income tax return.

26.    An S Corporation was a corporation that elected to pass corporate income, losses, deductions, and credits to the shareholders for federal tax purposes.

27.    "Pass-through" income was a term used to describe the income from certain entities such as LLCs, partnerships, and S Corporations because the entity itself did not pay taxes on its income and instead "passed" that income to the entity's members, partners, or owners.

28.    IRS Form 1041, U.S. Income Tax Return for Estates and Trusts ("Form 1041") was used by some trusts and estates to file an annual income tax return.

29.    Schedule K-1, Partner's Share of Income, Deductions, Credits, etc. was an IRS form that was attached to a Form 1065 and used by certain business entities to report a partner's share of income and deductions.

30.    Schedule K-1, Shareholder's Share of Income, Deductions, Credits, etc. was an IRS form that was attached to a Form 1120-S and used by S Corporations to report a shareholder's share of income and deductions.

31.    Schedule K-1, Beneficiary's Share of Income, Deductions, Credits, etc. was an IRS form that was attached to a Form 1041, when applicable, and used by trusts to report a distribution to a beneficiary.

32.    IRS Form SS-4, Application for Employer Identification Number ("Form SS-4") was used by employers, corporations, partnerships, trusts, and other entities to apply for an Employer Identification Number ("EIN"). An EIN was a unique identifier that the IRS assigned to certain businesses for identification purposes on income tax returns and other documents.

33.    IRS Form 1023, Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code ("Form 1023") was a form that a private foundation filed with the IRS to apply for tax-exempt status.

34.    IRS Form 1023-EZ, Streamlined Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code ("Form 1023-EZ") was a streamlined form that certain eligible private foundations could file in lieu of a Form 1023 when applying for tax-exempt status.

35.    IRS Form 990-PF, Return of Private Foundation ("Form 990-PF") was a form used by tax-exempt private foundations and other tax-exempt entities to file an annual information return and report charitable distributions and activities.

**Definitions and Tax Rules for Trusts & Foundations**

36.    Under the Internal Revenue Code and associated regulations, a trust was an arrangement in which a trustee took title to property for the purpose of protecting or conserving it for the beneficiary. Trusts were formed under state law, either by a will or by the signing of a trust agreement (also called a "trust instrument"). A trust involved three distinct parties: a grantor, a beneficiary, and a trustee.

37.    A grantor was the party that initially conveyed money, property, or other assets to the trust and thereby relinquished legal title of the property to the trust.

38.    A beneficiary was the party that benefitted from the assets conveyed to the trust.

39.    A trustee was the party responsible for managing the trust's assets for the benefit of the beneficiary.

40.    A grantor trust was a trust over which the grantor retained the power to control and direct the trust's income and assets. When the grantor retained control of the trust assets, the income of the trust was taxed to the grantor, meaning that the grantor had a duty to report such income on the grantor's Form 1040 and pay any federal income

tax owed on that income.

41.    A non-grantor trust was a trust over which the grantor did not retain the power to control and direct the trust's assets and instead conveyed that power to an independent trustee. The trustee was responsible for filing a Form 1041 reporting the non-grantor trust's annual income and paying any federal income tax owed on that income on the trust's behalf.

42.    A business trust was a type of trust generally created by its beneficiaries and used to carry on a profit-making activity. When a taxpayer carried on a profit-making business in the form of a business trust, the Internal Revenue Code and associated regulations provided that the business was to be taxed as a business entity.

43.    The Internal Revenue Code allowed non-grantor trusts to deduct costs which were paid or incurred in connection with the administration of the trust and which would not have been incurred if the property were not held in such trust.

44.    The Internal Revenue Code also allowed non-grantor trusts to deduct Distributable Net Income ("DNI"), which included the amounts paid, credited, or required to be distributed from the trust to its beneficiaries. Distributions from the trust to its beneficiaries were taxable to the beneficiary, meaning that the beneficiary had a duty to report the distribution as income on the beneficiary's tax return and pay any federal income tax owed on that distribution.

45.    If a trust lacked "economic substance," the IRS deemed the trust to be a sham trust and reassigned the trust's income to the grantor in his or her individual capacity. The grantor was then responsible for reporting the trust's income on a Form 1040 and paying taxes on that income.

46.     Under the Internal Revenue Code, a transaction (e.g., the creation of a trust) had economic substance if it met two requirements: First, the transaction meaningfully changed the taxpayer's economic position apart from federal income tax effects and, second, the taxpayer had a substantial purpose—apart from tax avoidance—for entering such transaction.

47.     A private foundation was an organization that could achieve federal tax-exempt status if it was organized and operated exclusively for one or more purposes set forth in the Internal Revenue Code, including charitable, religious, educational, and scientific purposes, among others. An organization was not tax-exempt under the Internal Revenue Code if any part of the net earnings inured to the benefit of any private shareholder or individual. To achieve federal tax-exempt status, a private foundation was required to file a Form 1023 or Form 1023-EZ.

48.     An Exemption Determination Letter was a letter that the IRS issued to an organization if the organization's application and supporting documents established that it met the particular requirements of the section under which the organization claimed tax-exempt status. The IRS issued an Exemption Determination Letter based on the representations made in the organization's application and supporting documents. If the organization did not operate exclusively for one or more purposes set forth in the Internal Revenue Code but represented on its application and supporting documents that it did, that organization was not tax-exempt.

49.     Taxpayers, including non-grantor trusts, could claim a tax deduction for a charitable contribution made within that tax year. To claim a charitable contribution tax deduction, the taxpayer was required to completely relinquish dominion and control over

the donated property and could not retain enjoyment of the assets or property donated or otherwise expect a substantial benefit in return.

### COUNT 1
**18 U.S.C. § 371**
(Conspiracy to Defraud the United States)

50.      The allegations set forth in paragraphs 1 through 49 of this Indictment are re-alleged and incorporated as if set forth fully herein.

51.      From in or around February 2018 and continuing until in or around August 2023, in the District of Colorado and elsewhere, defendants LARRY E. CONNER, TIMOTHY A. MCPHEE, MARCIA G. PREDMORE, RODERICK A. PRESCOTT, SUZANNE B. THOMPSON, and WELDON W. WULSTEIN, together with others known and unknown to the Grand Jury, did, for financial gain, unlawfully, voluntarily, and knowingly conspire and agree to conspire to defraud the United States by impeding, impairing, obstructing, and defeating the lawful Government functions of the IRS of the Department of the Treasury in the ascertainment, computation, assessment, and collection of the revenue, namely, federal individual income taxes.

### OBJECT OF THE CONSPIRACY

52.      From in or around February 2018 and continuing until in or around August 2023, it was the object of the conspiracy for CONNER, MCPHEE, PREDMORE, PRESCOTT, THOMPSON, and WULSTEIN, together with others known and unknown to the Grand Jury, to defraud the IRS for their own financial gain by promoting, selling, implementing, and assisting in the promotion, sale, and implementation of, a fraudulent tax shelter (hereinafter referred to as the "Abusive-Trust Tax Shelter") in which U.S. taxpayers fraudulently diverted nearly all of their income through a series of sham trusts

and a purported charitable foundation for purposes of evading the proper assessment of taxes owed on that income.

## MANNER AND MEANS OF THE CONSPIRACY

Acting interdependently, CONNER, MCPHEE, PREDMORE, PRESCOTT, THOMPSON, and WULSTEIN, together with others known and unknown to the Grand Jury, sought to accomplish the object of the conspiracy with the following manner and means, among others:

53.    It was part of the conspiracy that CONNER and MCPHEE, together with others known and unknown to the Grand Jury, marketed the Abusive-Trust Tax Shelter to U.S. taxpayers with the false promise that the taxpayers could lawfully eliminate taxes on nearly all of their annual business income by using the tax shelter.

54.    It was further part of the conspiracy that CONNER and MCPHEE, together with others known and unknown to the Grand Jury, instructed U.S. taxpayers (hereinafter "clients" or "prospective clients") to carry out the Abusive-Trust Tax Shelter using three sham trusts and a private family foundation. CONNER and MCPHEE instructed clients— most of whom were business owners—to nominally assign 98% ownership of their business to a sham "business trust" to create the illusion that the corresponding business income assigned to the sham trust was not earned by the client. The sham business trust then distributed its income to a second sham trust, which distributed its income to a third sham trust. Each trust in the series reported deductions matching or exceeding its income, and the third sham trust purportedly "donated" any remaining income to a purported private family foundation, which was also organized as a trust. The so-called private family foundation in turn "loaned" the funds back to the client's business or

business trust, tax free. As a result, the clients avoided paying income taxes on nearly all of their business income.

55.    It was further part of the conspiracy that CONNER and MCPHEE assured clients and prospective clients that despite the reassignment of business ownership and income, the taxpayers' business operations would not change and that the clients, as trustees, would retain complete control over their businesses and the income that the businesses generated.

56.    It was further part of the conspiracy that CONNER, MCPHEE, PRESCOTT, THOMPSON, and WULSTEIN, together with others known and unknown to the Grand Jury, promoted the Abusive-Trust Tax Shelter at virtual and in-person seminars and workshops held across the country and overseas. CONNER taught about the Abusive-Trust Tax Shelter at seminars he hosted in the name of TBSG and another entity called the LEGACY MANAGEMENT GROUP. MCPHEE taught about the tax shelter at seminars he and PREDMORE co-hosted in the name of PBC with the assistance of UNINDICTED CO-CONSPIRATOR 1 ("CC-1"). TBSG and PBC typically charged an attendance fee at the seminars. CONNER and MCPHEE taught about the Abusive-Trust Tax Shelter together and separately, including in the District of Colorado.

57.    It was further part of the conspiracy that at some of those seminars, PRESCOTT taught about the purported "private family foundation," which CONNER and MCPHEE advertised as the final step of the Abusive-Trust Tax Shelter. PRESCOTT promoted the private family foundation at seminars in the name of TSI with UNINDICTED CO-CONSPIRATOR 2 ("CC-2").

58.    It was further part of the conspiracy that THOMPSON and WULSTEIN

spoke at some of those seminars to promote the bookkeeping and tax return preparation services offered by CONCIERGE ACCOUNTANCY to clients using the Abusive-Trust Tax Shelter.

59.    It was further part of the conspiracy that CONNER typically charged clients between approximately $25,000 and $50,000 to purchase the Abusive-Trust Tax Shelter. CONNER, MCPHEE, and THOMPSON sent instructions directing clients to pay the fees by wire transfer to a bank account purportedly held in the name of TBSG (account number ******2915) (hereinafter the "TBSG bank account"). CONNER controlled and was a signatory for the TBSG bank account.

60.    It was further part of the conspiracy that MCPHEE and PREDMORE benefitted financially from the promotion of the Abusive-Trust Tax Shelter because PBC clients who used the tax shelter unlawfully paid less federal income taxes and thus had more money to spend on the products and "financial strategies" that MCPHEE and PREDMORE marketed and sold through PBC, including whole life insurance policies sold by PREDMORE and purported investment opportunities through which MCPHEE earned a commission.

61.    It was further part of the conspiracy that MCPHEE, PREDMORE, THOMPSON, and WULSTEIN recruited and referred prospective clients to CONNER to purchase the Abusive-Trust Tax Shelter. MCPHEE and PREDMORE did so with the assistance of CC-1.

62.    It was further part of the conspiracy that CONNER and MCPHEE relied on the assistance of PRESCOTT, CC-2, and UNINDICTED CO-CONSPIRATOR 3 ("CC-3"), among others known and unknown to the Grand Jury, to draft the instruments purporting

to create the sham trusts and foundations used to carry out the Abusive-Trust Tax Shelter and to send those instruments to the clients.

63.    It was further part of the conspiracy that CONNER purchased cashier's checks drawn from funds held in the TBSG bank account and made those checks out to various entities controlled by PRESCOTT, CC-2, and CC-3 to pay a share of the clients' fees to PRESCOTT, CC-2, and CC-3. From in or around February 2018 through in or around September 2023, CONNER paid hundreds of thousands of dollars in client fees to PRESCOTT, CC-2, and CC-3 for the preparation of trust and foundation instruments.

64.    It was further part of the conspiracy that CONNER, MCPHEE, PRESCOTT, THOMPSON, and WULSTEIN, together with others known and unknown to the Grand Jury, told clients to pay for personal expenses with funds held in the bank accounts for the sham trusts and foundations to create the illusion that those expenses were expenses of the trusts and foundations, not personal expenses.

65.    It was further part of the conspiracy that CONNER and MCPHEE, together with others known and unknown to the Grand Jury, directed clients to transfer real estate and other assets, such as vehicles, to the clients' sham trusts to create the illusion that the clients did not own those assets and ultimately to avoid paying income taxes on any capital gains incurred from selling those assets. CONNER and MCPHEE assured clients that after conveying personal property to their sham trusts, the clients would retain full dominion and control over the use and enjoyment of the property.

66.    It was further part of the conspiracy that PRESCOTT advised clients who purchased the Abusive-Trust Tax Shelter how to use the so-called "private family foundation" to avoid paying taxes on income earned. PRESCOTT instructed clients to

14

"donate" income to their private family foundation and claim the amount donated as a deduction, thereby improperly reducing the client's taxes owed. PRESCOTT further instructed clients to spend the funds "donated" to their private family foundation for their own personal use and to disguise the transactions to make them appear charitable.

67.    It was further part of the conspiracy that PRESCOTT used the alias "Rick Scott" in email correspondence and on private family foundation promotional materials to conceal his true identity and prior permanent injunction from clients. PRESCOTT also used CC-2 as an intermediary when communicating with clients via email about the private family foundations and trusts to further conceal his true identity.

68.    It was further part of the conspiracy that CONNER, MCPHEE, PREDMORE, PRESCOTT, WULSTEIN, and THOMPSON assured many individuals, including clients and prospective clients, that the Abusive-Trust Tax Shelter was a legal tax-reduction method, despite knowing that it was created and designed to fraudulently shelter a significant portion of U.S. taxpayers' income from the IRS.

69.    It was further part of the conspiracy that CONNER and MCPHEE, together with others known and unknown to the Grand Jury, directed clients to report income and deductions on Forms 1040 and Forms 1041 in a manner that fraudulently eliminated nearly all taxes owed.

70.    It was further part of the conspiracy that CONNER, MCPHEE, and PREDMORE referred clients to THOMPSON and WULSTEIN for bookkeeping and tax return preparation services consistent with the Abusive-Trust Tax Shelter. THOMPSON and WULSTEIN jointly offered their respective businesses' bookkeeping and tax return preparation services to clients for a fee in the name of CONCIERGE ACCOUNTANCY.

71.    It was further part of the conspiracy that THOMPSON and WULSTEIN agreed to pay MCPHEE and PREDMORE a referral fee for clients referred to CONCIERGE ACCOUNTANCY by PBC.

72.    It was further part of the conspiracy that THOMPSON prepared, and directed her employees at the CFO AGENCY to prepare, financial statements for clients using the Abusive-Trust Tax Shelter. Those financial statements reported, among other items, income and expenses for the clients' businesses, purported trusts, and purported private family foundations. THOMPSON then shared, and directed her employees to share, those financial statements with WULSTEIN FINANCIAL SERVICES for use in the preparation of individual, business, trust, and foundation tax returns for clients who used the Abusive-Trust Tax Shelter.

73.    It was further part of the conspiracy that CONNER and MCPHEE also referred clients to other tax return preparers trained on the Abusive-Trust Tax Shelter, in addition to WULSTEIN. These return preparers included, among others known and unknown to the Grand Jury, RETURN PREPARER 1 ("RP-1") and RETURN PREPARER 2 ("RP-2"). The clients paid these return preparers directly for their services, which included, among others, the preparation and filing of false Forms 1040, Forms 1041, and Forms 990-PF.

74.    It was further part of the conspiracy that WULSTEIN, RP-1, and RP-2 prepared and filed many false and fraudulent Forms 1040, Forms 1041, and Forms 990-PF for clients who purchased the Abusive-Trust Tax Shelter in accordance with CONNER's and MCPHEE's guidance. The preparation and filing of these false and

fraudulent tax returns caused a loss of tens of millions of dollars to the U.S. Treasury in the form of unpaid federal income taxes.

## OVERT ACTS

In furtherance of the conspiracy, the following overt acts were committed within the District of Colorado and elsewhere, among others:

75.    On or about February 28, 2018, MCPHEE emailed CONNER to inquire about a referral agreement and promotional materials for the Abusive-Trust Tax Shelter, writing: "A quick reminder I still need the power point and the audio of the phone call as well as the referral agreement. . . . I have a fourth client that wants the info now as well."

76.    On or about April 23, 2018, CONNER emailed MCPHEE a slideshow illustrating step-by-step how to carry out the Abusive-Trust Tax Shelter (hereinafter the "TBSG Slideshow") and wrote: "As we discussed. . . . I will get you that agreement we spoke of as soon as I get back to office."

77.    On or about September 4, 2018, CONNER emailed client R.U. three documents titled "Certification of Trustee," one for each of R.U.'s sham trusts, along with copies of letters from the IRS assigning R.U.'s sham trusts an EIN. In the email body, CONNER wrote: "Your documents are private contracts and no one should review your governing instrument."

78.    On or about September 24, 2018, MCPHEE referred prospective clients J.V. and M.B.H. to CONNER via email. When describing J.V. and M.B.H. to CONNER, MCPHEE wrote: "We have had the privilege of getting to know them over the last few months and are working on a Private Banking Concepts™ program for them. Through years of hard work and perseverance they have created an amazing business and

lifestyle which they need to protect from those who would like to take it from them includ[ing] the IRS. . . . As we worked through an understanding of their finances it became apparent that they are an excellent candidate for the work that you do and have done for us and many of our other clients. I have shared an overview of the system with them and told them I would make an introduction."

79.    On or about October 12, 2018, PREDMORE emailed client J.H. to share information about CONNER's "advanced trustee" seminar in Cabo San Lucas, Mexico on November 3rd and 4th, 2018.

80.    On or about December 1st and 2nd, 2018, CONNER and PRESCOTT co-hosted a workshop promoting the Abusive-Trust Tax Shelter at a hotel in Irving, Texas.

81.    On or about December 8, 2018, CONNER emailed client S.B. a questionnaire (hereinafter the "TBSG Questionnaire") and wrote: "Please review and complete the enclosed questionnaire. Once you have completed the document, we can schedule a time to map a specific plan for you."

82.    On or about December 13, 2018, CONNER emailed client S.B. a document illustrating how income would flow from S.B.'s business entities to S.B.'s sham trusts and foundation, writing: "Flow chart as it pertains to income you control."

83.    On or about January 1, 2019, CONNER signed as the "Exchange Broker" for a trust instrument purporting to create a trust with the initials L.M.C.C. that listed clients L.M. and P.M. as the trustees.

84.    On or about January 1, 2019, CONNER signed as the "Exchange Broker" for a trust instrument purporting to create a trust with the initials M.F.T. that listed clients L.M. and I.G. as the trustees.

85.     On or about January 23, 2019, PREDMORE referred prospective client D.A. to CONNER via email to purchase the Abusive-Trust Tax Shelter. In her email to D.A. and CONNER, PREDMORE attached the TBSG Slideshow.

86.     On or about January 29, 2019, PREDMORE referred prospective clients C.K. and B.B. to CONNER via email to purchase the Abusive-Trust Tax Shelter. In PREDMORE's email to C.K., B.B., and CONNER, PREDMORE attached the TBSG Slideshow.

87.     On or about March 18, 2019, CONNER emailed client S.B. a blank application (hereinafter, "the TBSG Application") for three sham trusts and a private family foundation and attached to the email a TBSG service agreement and wiring instructions for payment to the TBSG bank account.

88.     On or about April 8, 2019, CONNER emailed client S.B.'s TBSG Application for three sham trusts to CC-2 for the preparation of the trust instruments, along with a cover letter stating that CONNER sent a cashier's check for $4,000.

89.     On or about April 8, 2019, CONNER emailed client S.B. a document titled "Abusive Trust Arrangements," which provided responses to warnings on the IRS's website about abusive trust tax evasion schemes and purported to explain why the Abusive-Trust Tax Shelter differed from the schemes described in the warnings. CONNER wrote in the email body: "Explination [sic] regarding abusive trust."

90.     On or about April 8, 2019, PREDMORE forwarded client C.K. an email from MCPHEE, which purported to explain why the Abusive-Trust Tax Shelter complied with IRS rules.

91.     On or about May 1, 2019, CONNER emailed client S.B.'s TBSG Application

for a purported private family foundation to CC-2 for the preparation of the foundation instrument, along with a cover letter stating that CONNER sent a cashier's check for $7,500.

92.    On or about May 2, 2019, CONNER emailed client S.B. a copy of a letter from the IRS assigning an EIN to S.B.'s sham business trust and wrote: "[Y]ou will need this to get [the] bank account set up. Can only get one trust per Trustee per day. You can wait to get all EINs before going to the bank or you can set up Business trust first and then set the other two up at [the] same time. It doesn't matter."

93.    On or about June 27, 2019, CONNER emailed client R.U. an invitation to his "advanced trustee" workshop in Cabo San Lucas, Mexico, writing: "We are hosting another advanced trustee workshop in Cabo San Lucas, Mexico on November 2nd and 3rd 2019. During this event, we will dive deeper into the inner workings and day-to-day management of the trust series, private family foundation, business structures, tax strategies, financial tools, and more."

94.    On or about September 12, 2019, MCPHEE referred prospective clients S.F. and J.F. to CONNER via email to purchase the Abusive-Trust Tax Shelter. MCPHEE attached the TBSG Slideshow and TBSG Questionnaire to his email and wrote, "Larry, I would like to introduce you to [S.F.] & [J.F.]. They are longtime friends and [are] currently working on establishing their first Private Banking Program. After meeting it became apparent that they, like so many successful families, are in need of the Trust and Foundation system to manage their assets and liabilities." MCPHEE further wrote to S.F. and J.F.: "Please fill out [the] TBSG Questionnaire, attached, and return [it] to Larry, prior to your meeting/call, as this is information he will need to properly structure your account

20

and to answer questions about your structure."

95.    On or about October 5, 2019, PREDMORE sent CONNER a text message to inform him that client L.B. wanted to "move forward" but had not heard back from CONNER.

96.    On or about November 2nd and 3rd, 2019, CONNER hosted an "advanced trustee" workshop in Cabo San Lucas, Mexico, at which he promoted the Abusive-Trust Tax Shelter.

97.    On or about November 2nd and 3rd, 2019, MCPHEE and PREDMORE attended CONNER's "advanced trustee" workshop in Cabo San Lucas, Mexico, during which MCPHEE taught a workshop in the name of PBC.

98.    On or about January 21, 2020, PRESCOTT—using CC-2 as an intermediary—emailed client J.V. about a letter J.V. received from the IRS regarding the private family foundation J.V. purchased from CONNER. PRESCOTT wrote: "Good morning [J.V.], Please find attached suggested responses to the letter from the IRS. You may use these responses as they are written. Although these IRS letter requests are infrequent they do on occasion occur as you are experiencing. There is no worries as it is part of the process for acquiring the determination letter for exempt status. Simply respond as I have indicated and you will be fine." PRESCOTT attached to the email a document that provided scripted responses to the IRS's questions about J.V.'s private family foundation.

99.    On or about February 1st and 2nd, 2020, CONNER, MCPHEE, and PREDMORE co-hosted a workshop promoting the Abusive-Trust Tax Shelter in Denver, Colorado.

100.    On or about February 11, 2020, PREDMORE emailed client S.P.B. explaining that "monies distributed" from a life insurance policy "inside a Trust" are "tax free."

101.    On or about February 18, 2020, PRESCOTT emailed CC-2 with the subject line "Larry Connor," writing: "I have attached a trustee resignation letter template and an appointment letter template. As trustee you may alter, change or add as you see fit." PRESCOTT attached two template documents to the email, one titled "Appointment and Acceptance of Trustee" and the other titled "Resignation of Trustee."

102.    On or about March 9, 2020, CONNER emailed clients B.W. and S.P.-W.'s TBSG Application for three sham trusts to CC-2 for the preparation of the trust instruments, along with a cover letter stating that CONNER sent a cashier's check for $4,000.

103.    On or about April 1, 2020, PRESCOTT—using CC-2 as an intermediary—emailed client J.H. a document titled "Audit explanation," which provided scripted responses to the IRS's questions about the private family foundation J.H. purchased from CONNER. In his email, PRESCOTT wrote: "Please find attached suggestions for the IRS questions. You may use them as you deem appropriate. They have always been sufficient in the past. Once you respond your determination letter for tax exemption will soon follow."

104.    In or around May 2020, THOMPSON, WULSTEIN, MCPHEE, and PREDMORE agreed to a referral arrangement in which CONCIERGE ACCOUNTANCY would pay PBC 10% of the monthly fee for a new client's first year of service in exchange for the referral to CONCIERGE ACCOUNTANCY.

105.    On or about May 15, 2020, CC-2 emailed client M.C. to schedule a

conference call between M.C., CC-2, and PRESCOTT to discuss M.C.'s questions about the private family foundation M.C. purchased from CONNER.

106.    On or about June 2, 2020, PREDMORE referred clients R.U. and Y.U. via email to THOMPSON and WULSTEIN for accounting, bookkeeping, and tax return preparation services consistent with the Abusive-Trust Tax Shelter.

107.    On or about June 24, 2020, PREDMORE emailed client R.U. to recommend the services of CONCIERGE ACCOUNTANCY.

108.    On or about August 12, 2020, PRESCOTT—using CC-2 as an intermediary—emailed client P.G. to explain that P.G. could loan funds from P.G.'s private family foundation to P.G.'s family trust and then use those funds to pay off P.G.'s daughter's student loans.

109.    On August 28, 2020, PRESCOTT—using CC-2 as an intermediary—responded to questions posed by client P.S. regarding whether the IRS could "'trace' [P.S.'s foreign-sourced] money to [P.S.'s] personal SSN[.]" PRESCOTT told P.S. that "[o]nce it is in the trust it is not yours it belongs to the trust" and that afterward, P.S. could make an "anonymous" donation to P.S.'s private foundation to create the appearance that the purported donation "did not come from you personally[.]"

110.    On or about September 2, 2020, MCPHEE emailed THOMPSON a document provided by CONNER titled, "TRUST BANK ACCOUNT WORKSHEET 7242020." In the email, MCPHEE wrote: "Sue, I asked Larry to provide a preferred chart of accounts for the Trusts. See attached. Let me know if we need to review together with Larry."

111.   On or about September 12, 2020, MCPHEE referred client B.B. via email to THOMPSON and WULSTEIN for accounting, bookkeeping, and tax return preparation services consistent with the Abusive-Trust Tax Shelter. In his email, MCPHEE described THOMPSON and WULSTEIN as "referral partners."

112.   On or about September 30, 2020, THOMPSON emailed WULSTEIN a spreadsheet titled "Consolidated Financials," which listed the balance sheet and profit and loss figures for clients R.U. and Y.U.'s purported trusts and foundation and for R.U.'s business. In her email, THOMPSON wrote: "Hi Weldon; Here are the numbers for our appointment with [R.U.] tomorrow – all supporting financials are in smartvault."

113.   On or about October 12, 2020, CONNER forwarded clients B.B. and J.B.'s TBSG Application for three sham trusts to CC-2 for the preparation of the trust instruments, along with a cover letter stating that CONNER sent a cashier's check for $4,000.

114.   On or about October 22, 2020, PRESCOTT—using CC-2 as an intermediary—emailed client M.T. to respond to M.T.'s concerns about how to use the private family foundation, writing: "In response to your concerns I would suggest that you go to our website (thestewardshipinstitute.com) and view the video. . . . The Stewardship Institute is a learning organization and therefore TSI not only provides the documentation you need to be a tax exempt qualified 501(c)(3) but the education and understanding behind it. . . . Keep in mind that everything we provide has been reviewed and approved of by the IRS."

115.   In or around December 2020, PRESCOTT created an encrypted email address using the alias "Rick Scott," which he used to communicate with clients.

116.    In or around May 2021, PRESCOTT created a purported charitable organization called OPEN ROAD FOUNDATION, which he used, among other entities, to receive his share of clients' fees from CONNER.

117.    On or about May 25, 2021, CONNER, MCPHEE, PREDMORE, THOMPSON, and WULSTEIN met via a videoconference, during which CONNER taught THOMPSON and WULSTEIN about "Trust accounting" for the Abusive-Trust Tax Shelter.

118.    On or about June 23, 2021, CONNER emailed client R.U. and directed R.U. to treat funds that R.U. transferred from R.U.'s sham family trust bank account to R.U.'s personal bank account as "income or asset[s]" of R.U.'s sham family trust, not as "personal income or asset[s]."

119.    On or about September 2, 2021, MCPHEE emailed clients A.S. and J.S. to invite them to a workshop about the Abusive-Trust Tax Shelter hosted by CONNER in Irving, Texas on September 18th and 19th, 2021.

120.    On or about September 7, 2021, WULSTEIN filed and caused to be filed the Form 1120-S for clients B.B. and J.B.'s business, B.C. LLC, for tax year 2020, which assigned 98% of the ordinary business income via a Schedule K-1 to a purported business trust controlled by B.B. and J.B. with the initials A.D.I.O.

121.    On or about September 7, 2021, WULSTEIN filed and caused to be filed the Form 1041 for clients B.B. and J.B.'s purported business trust, A.D.I.O., for tax year 2020.

122.    On or about September 7, 2021, WULSTEIN filed and caused to be filed the Form 1041 for clients B.B. and J.B.'s purported family trust, N.P.F.T., for tax year 2020.

123.    On or about September 7, 2021, WULSTEIN filed and caused to be filed the Form 1041 for clients B.B. and J.B.'s purported charitable trust, A.T.O.F.C.T., for tax year 2020.

124.    On or about September 8, 2021, WULSTEIN filed and caused to be filed clients B.B. and J.B.'s joint Form 1040 for tax year 2020, which falsely reported only a fraction of the couple's business income and thus underreported the federal income tax due.

125.    On or about September 15, 2021, WULSTEIN filed and caused to be filed the Form 1065 for client R.U.'s business, R.U.D. LLC, for tax year 2020, which assigned via a Schedule K-1 90% of the ordinary business income to a purported business trust controlled by R.U. and Y.U. with the initials S.H.T.

126.    On or about September 16, 2021, WULSTEIN filed and caused to be filed the Form 1041 for clients R.U. and Y.U.'s purported business trust, S.H.T., for tax year 2020.

127.    On or about September 16, 2021, WULSTEIN filed and caused to be filed the Form 1041 for clients R.U. and Y.U.'s purported family trust, T.O.L.F.T., for tax year 2020.

128.    On or about September 16, 2021, WULSTEIN filed and caused to be filed the Form 1041 for clients R.U. and Y.U.'s purported charitable trust, R.O.I.C.T., for tax year 2020.

129.    On or about September 16, 2021, WULSTEIN filed and caused to be filed the Form 990-PF for clients R.U. and Y.U.'s purported private family foundation, F.H.T.F., for tax year 2020.

130.    On or about September 17, 2021, WULSTEIN filed and caused to be filed clients R.U. and Y.U.'s joint Form 1040 for tax year 2020, which falsely reported only a fraction of the couple's business income and thus underreported the federal income tax due.

131.    On or about September 18th and 19th, 2021, CONNER, MCPHEE, PREDMORE, and PRESCOTT co-hosted a workshop promoting the Abusive-Trust Tax Shelter in Irving, Texas.

132.    On or about September 29, 2021, PRESCOTT opened a checking account at a bank in the name of OPEN ROAD FOUNDATION, which listed PRESCOTT and his spouse as co-signers.

133.    On or about November 6, 2021, through on or about November 9, 2021, CONNER hosted an "advanced trustee" workshop in Cabo San Lucas, Mexico, at which he promoted the Abusive-Trust Tax Shelter.

134.    On or about November 6, 2021, through on or about November 9, 2021, MCPHEE and PREDMORE attended CONNER's "advanced trustee" workshop in Cabo San Lucas, Mexico and taught seminars on behalf of PBC.

135.    On or about November 24, 2021, PRESCOTT—using CC-2 as an intermediary—emailed client T.F. approving of T.F.'s plan to "donate $100K" to T.F.'s private family foundation and then invest that money in T.F.'s business trust "a few days later" to reduce the tax penalty T.F. incurred from taking money out of certain accounts. PRESCOTT told T.F. that the plan was "reasonable" as it "allows you to use those funds to further your charitable interests." In his email response, PRESCOTT attached a

document titled "standard promissory note" for T.F. to use to prepare a contract between T.F.'s sham business trust and so-called private family foundation.

136.    On or about December 9, 2021, PRESCOTT—using CC-2 as an intermediary—advised client T.F. to transfer via a quitclaim deed, that is, a document used to transfer property from one party to another, real estate property to T.F.'s purported private family foundation so T.F. could deduct the "interest and principle [sic] as charitable contributions" on T.F.'s individual income tax return.

137.    On or about December 14, 2021, THOMPSON referred prospective client L.S. to CONNER via email to purchase the Abusive-Trust Tax Shelter. In THOMPSON's email to L.S. and CONNER, THOMPSON attached the TBSG Questionnaire, TBSG Application, and TBSG Slideshow.

138.    On or about December 20, 2021, THOMPSON emailed client J.S. a document that THOMPSON said could be used to transfer a condominium owned by clients J.S. and A.S. via a quitclaim deed into the name of one of J.S. and A.S.'s purported trusts.

139.    On or about December 28, 2021, WULSTEIN emailed MCPHEE and THOMPSON, writing: "I have a new client that I think would be a good candidate for the trust system. I would like to setup [sic] a meeting with the four of us the second week of January. Can you guys let me know your schedules[.]"

140.    On or about January 3, 2022, PRESCOTT emailed CC-2 a document titled "MINUTES OF TRUSTEES 2022," which provided a template to document the minutes of a trustee meeting.

141.    On or about January 31, 2022, MCPHEE promoted the Abusive-Trust Tax

Shelter to an undercover agent ("UCA 1") posing as a prospective client via a videoconference. During the conversation, MCPHEE said that he knew of a trust structure that could reduce UCA 1's tax liability by about 95% to 98%. MCPHEE added that he had a team of bookkeepers and accountants who could help UCA 1 "minimize taxation." MCPHEE also explained that UCA 1 could utilize a series of trusts—a "business trust," a "family trust," and a "charitable trust"—to "deal" with the taxes owed for businesses or investments.

142.    On or about February 19, 2022, MCPHEE met in-person with UCA 1 at a restaurant in Estes Park, Colorado and explained in detail how taxpayers can use the Abusive-Trust Tax Shelter to substantially reduce their tax liability. MCPHEE explained that there was "[n]o limitations whatsoever at all" on how a taxpayer could spend the money held in a trust and said that all the money spent from a trust bank account—for example on a pool, car, meals, gifts, entertainment, or private school tuition—is a deduction.

143.    On or about March 19th and 20th, 2022, THOMPSON attended a workshop promoting the Abusive-Trust Tax Shelter hosted by MCPHEE and PREDMORE in Fort Myers, Florida to advertise the services offered by CONCIERGE ACCOUNTANCY.

144.    On or about March 26th and 27th, 2022, THOMPSON attended a workshop promoting the Abusive-Trust Tax Shelter hosted by MCPHEE and PREDMORE in Denver, Colorado to advertise the services offered by CONCIERGE ACCOUNTANCY.

145.    On or about March 29, 2022, THOMPSON referred prospective clients M.H. and P.H. to CONNER and MCPHEE via email to purchase the Abusive-Trust Tax Shelter. In THOMPSON's email to M.H., P.H., CONNER, and MCPHEE, THOMPSON attached

the TBSG Questionnaire, TBSG Application, and TBSG Slideshow.

146.    On or about July 9th and 10th, 2022, CONNER and PRESCOTT co-hosted a workshop promoting the Abusive-Trust Tax Shelter at a hotel in Frisco, Texas.

147.    On or about August 17, 2022, THOMPSON referred prospective client H.K. to CONNER via email to purchase the Abusive-Trust Tax Shelter. In THOMPSON's email to H.K. and CONNER, THOMPSON attached the TBSG Questionnaire, TBSG Application, and TBSG Slideshow.

148.    On or about August 18, 2022, WULSTEIN filed and caused to be filed the Form 1065 for clients S.P.-W. and B.W.'s business, D.A. LLC, for tax year 2021, which assigned via a Schedule K-1 98% of the ordinary business income to a purported business trust controlled by S.P.-W. and B.W. with the initials H.W.G.

149.    On or about August 18, 2022, WULSTEIN filed and caused to be filed the Form 1041 for clients S.P.-W. and B.W.'s purported business trust, H.W.G., for tax year 2021.

150.    On or about August 18, 2022, WULSTEIN filed and caused to be filed the Form 1041 for clients S.P.-W. and B.W.'s purported family trust, E.E.T., for tax year 2021.

151.    On or about August 18, 2022, WULSTEIN filed and caused to be filed the Form 1041 for clients S.P.-W. and B.W.'s purported charitable trust, T.F.C.T., for tax year 2021.

152.    On or about August 18, 2022, WULSTEIN filed and caused to be filed the Form 990-PF for clients S.P.-W. and B.W.'s purported private family foundation, T.I.T.F., for tax year 2021.

153.    On or about August 24, 2022, WULSTEIN filed and caused to be filed clients S.P.-W. and B.W.'s joint Form 1040 for tax year 2021, which falsely reported only a fraction of the couple's business income and thus underreported the federal income tax due.

154.    On or about August 29, 2022, WULSTEIN filed and caused to be filed the Form 1065 for clients B.B. and J.B.'s business, B.C. LLC, for tax year 2021, which assigned via a Schedule K-1 98% of the ordinary business income to a purported business trust controlled by B.B. and J.B. with the initials A.D.I.O.

155.    On or about August 29, 2022, WULSTEIN filed and caused to be filed the Form 1041 for clients B.B. and J.B.'s purported business trust, A.D.I.O., for tax year 2021.

156.    On or about August 29, 2022, WULSTEIN filed and caused to be filed the Form 1041 for clients B.B. and J.B.'s purported family trust, N.P.F.T., for tax year 2021.

157.    On or about August 29, 2022, WULSTEIN filed and caused to be filed the Form 1041 for clients B.B. and J.B.'s purported charitable trust, A.T.O.F.C.T., for tax year 2021.

158.    On or about September 1, 2022, WULSTEIN filed and caused to be filed clients B.B. and J.B.'s joint Form 1040 for tax year 2021, which falsely reported only a fraction of the couple's business income and thus underreported the federal income tax due.

159.    On or about September 15, 2022, WULSTEIN filed and caused to be filed clients A.S. and J.S.'s joint Form 1040 for tax year 2021, which falsely reported only a fraction of the couple's business income and thus underreported the federal income tax due.

160.    On or about September 15, 2022, WULSTEIN filed and caused to be filed the Form 1120-S for clients A.S. and J.S.'s business, A.G.S. LLC, for tax year 2021, which assigned via a Schedule K-1 96% of the ordinary business income to a purported business trust controlled by A.S. and J.S. with the initials A.G.S.V.

161.    On or about September 15, 2022, WULSTEIN filed and caused to be filed the Form 1041 for clients A.S. and J.S.'s purported business trust, A.G.S.V., for tax year 2021.

162.    On or about September 15, 2022, WULSTEIN filed and caused to be filed the Form 1041 for clients A.S. and J.S.'s purported family trust, K.T.F.T., for tax year 2021.

163.    On or about September 15, 2022, WULSTEIN filed and caused to be filed the Form 1041 for clients A.S. and J.S.'s purported charitable trust, A.C.C.T., for tax year 2021.

164.    On or about January 29, 2023, MCPHEE and PREDMORE co-hosted a seminar promoting the Abusive-Trust Tax Shelter at a hotel in Austin, Texas, during which MCPHEE told the audience that a taxpayer cannot claim the tax benefits MCPHEE taught about if the taxpayer was both the grantor and trustee of a trust. MCPHEE thus explained that "somebody else literally becomes the grantor, and then they turn it over to you. It'll all happen in five minutes, and they'll all turn it over to you, and now you're the trustee in charge, but they're the ones that granted the trust[.]"

165.    On or about February 5th and 6th, 2023, CONNER and PRESCOTT co-hosted a workshop promoting the Abusive-Trust Tax Shelter on a cruise through the Caribbean Sea.

166.    On or about February 12th and 13th, 2023, THOMPSON attended a workshop promoting the Abusive-Trust Tax Shelter hosted by MCPHEE and PREDMORE in Tarzana, California to advertise the services offered by CONCIERGE ACCOUNTANCY.

167.    On or about February 12th and 13th, 2023, WULSTEIN attended a workshop promoting the Abusive-Trust Tax Shelter hosted by MCPHEE and PREDMORE in Tarzana, California to advertise the services offered by CONCIERGE ACCOUNTANCY.

168.    On or about February 17, 2023, after an individual with the initials B.W. emailed PREDMORE to raise concerns about articles indicating that the Abusive-Trust Tax Shelter is a "scam," PREDMORE responded: "We have seen this many times[.] I will also let Tim chime in but we are NOT the GRANTOR of the trusts[.]"

169.    On or about March 6, 2023, PRESCOTT emailed CC-2 a document titled "DECLARATION OF TRUST AGREEMENT," writing: "[CC-2], here is a foundation template with a family trust as the founder."

170.    On or about April 11, 2023, WULSTEIN filed and caused to be filed the Form 1065 for clients B.B. and J.B.'s business, B.C. LLC, for tax year 2022, which assigned via a Schedule K-1 98% of the ordinary business income to a purported business trust controlled by B.B. and J.B. with the initials A.D.I.O.

171.    On or about April 11, 2023, WULSTEIN filed and caused to be filed the Form 1041 for clients B.B. and J.B.'s purported business trust, A.D.I.O., for tax year 2022.

172.    On or about April 11, 2023, WULSTEIN filed and caused to be filed the Form 1041 for clients B.B. and J.B.'s purported family trust, N.P.F.T., for tax year 2022.

173.    On or about April 11, 2023, WULSTEIN filed and caused to be filed the Form 1041 for clients B.B. and J.B.'s purported charitable trust, A.T.O.F.C.T., for tax year 2022.

174.    On or about April 12, 2023, WULSTEIN filed and caused to be filed clients B.B. and J.B.'s joint Form 1040 for tax year 2022, which falsely reported only a fraction of the couple's business income and thus underreported the federal income tax due.

175.    On or about May 9, 2023, CONNER met with an undercover agent ("UCA 2") posing as a potential client. During their conversation, CONNER explained to UCA 2 how to use the Abusive-Trust Tax Shelter to avoid paying taxes on gains from real estate sales. CONNER further advised UCA 2 that even if UCA 2 conveyed UCA 2's home to a trust, UCA 2 would retain the full use and enjoyment of the home and would continue to "control everything."

176.    On or about July 5, 2023, CC-2 mailed trust instruments to UCA 2 purporting to create three trusts. For each purported trust, CC-2 provided two versions of the trust instrument, one titled "Banking Documents" and the other purporting to create a "Pure Trust Organization in Common Law."

177.    On or about August 7, 2023, CONNER instructed UCA 2 how to set up UCA 2's purported trusts. During a phone conversation, CONNER advised UCA 2 that the individuals signing as "Creator/Settlor" and "Exchange Broker" for UCA 2's trust instruments were simply "glorified witnesses" and should not be allowed to read the trust instruments they were signing.

In violation of Title 18, United States Code, Section 371.

**COUNTS 2 – 7**
**26 U.S.C. § 7206(2)**
(Aiding and Assisting in the Preparation
of Materially False Income Tax Returns)

178.    The allegations set forth in paragraphs 1 through 49 and 52 through 177 of this Indictment are re-alleged and incorporated as if set forth fully herein.

179.    From in or around February 2018, through on or about April 12, 2023, in the District of Colorado and elsewhere, defendants LARRY E. CONNER, TIMOTHY A. MCPHEE, SUZANNE B. THOMPSON, and WELDON W. WULSTEIN willfully aided and assisted in, and procured, counseled, and advised the preparation and presentation to the IRS of materially false and fraudulent Forms 1040 for the taxpayers and calendar years set forth in the table below, each such return constituting a separate count. The Forms 1040 were false and fraudulent as to a material matter because the Forms 1040 substantially underreported the taxpayers' total income listed on the Schedules E, Line 41.

| Count | Taxpayers | Year | Approx. Filing Date | False Item |
|-------|-----------|------|---------------------|------------|
| 2 | B.B. & J.B. | 2020 | 9/8/2021 | Form 1040, Schedule E, Line 41, Total income or (loss) of $960 |
| 3 | B.B. & J.B. | 2021 | 9/1/2022 | Form 1040, Schedule E, Line 41, Total income or (loss) of $3,183 |
| 4 | B.B. & J.B. | 2022 | 4/12/2023 | Form 1040, Schedule E, Line 41, Total income or (loss) of $11,923 |
| 5 | A.S. & J.S. | 2021 | 9/15/2022 | Form 1040, Schedule E, Line 41, Total income or (loss) of $69,725 |
| 6 | R.U. & Y.U. | 2020 | 9/17/2021 | Form 1040, Schedule E, Line 41, Total income or (loss) of $49,949 |
| 7 | B.W. & S.P.-W. | 2021 | 8/24/2022 | Form 1040, Schedule E, Line 41, Total income or (loss) of $83,086 |

In violation of Title 26, United States Code, Section 7206(2).

## COUNTS 8 & 9
### 26 U.S.C. § 7206(2)
(Aiding and Assisting in the Preparation
of Materially False Income Tax Returns)

180.    The allegations set forth in paragraphs 1 through 49 and 52 through 177 of this Indictment are re-alleged and incorporated as if set forth fully herein.

181.    From in or around February 2018, through on or about April 18, 2023, in the District of Colorado and elsewhere, defendants LARRY E. CONNER and TIMOTHY A. MCPHEE willfully aided and assisted in, and procured, counseled, and advised the preparation and presentation to the IRS of materially false and fraudulent Forms 1040 for the taxpayers and calendar years set forth in the table below, each such return constituting a separate count. The Forms 1040 were false and fraudulent as to a material matter because the Forms 1040 substantially underreported the taxpayers' total income listed on the Schedules E, Line 41.

| Count | Taxpayers | Year | Approx. Filing Date | False Item |
|-------|-----------|------|---------------------|------------|
| 8 | S.F. & J.F. | 2021 | 4/13/2022 | Form 1040, Schedule E, Line 41, Total income or (loss) of -$17,728 |
| 9 | S.F. & J.F. | 2022 | 4/18/2023 | Form 1040, Schedule E, Line 41, Total income or (loss) of $38,892 |

In violation of Title 26, United States Code, Section 7206(2).

## COUNT 10
### 26 U.S.C. § 7201
(Evasion of Assessment of Taxes for Tax Year 2016)

182.    The allegations set forth in paragraphs 1 through 49 and 52 through 177 of this Indictment are re-alleged and incorporated as if set forth fully herein.

183.    From on or about February 23, 2016, through on or about October 15, 2019, in the District of Colorado and elsewhere, defendants TIMOTHY A. MCPHEE and MARCIA G. PREDMORE willfully attempted to evade and defeat a substantial amount of income tax due and owing by them to the United States of America for tax year 2016 by committing at least one of the following affirmative acts of evasion, among others:

    a.  The acts described in paragraphs 75, 78, 79, 85, 86, 90, 94, 95, 97, 99, 100, 104, 106, 107, 110, 111, 117, 119, 131, 134, 141, 142, 164, and 168 of this Indictment.

    b.  On or about February 23, 2016, MCPHEE and PREDMORE purported to create an irrevocable "Pure Trust Organization in Common Law" called MDH FAMILY TRUST.

    c.  On or about July 7, 2016, MCPHEE and PREDMORE provided a bank ("Bank A") with a signed and notarized document titled "Certification of Trust" for MDH FAMILY TRUST, which listed MCPHEE and PREDMORE as the trustees of MDH FAMILY TRUST.

    d.  On or about September 9, 2016, MCPHEE and PREDMORE signed a document titled "Declaration of Trust Agreement" that purported to create an entity called the TIMOTHY AND MARCIA MCPHEE FAMILY FOUNDATION. MCPHEE and PREDMORE named themselves as trustees of the TIMOTHY AND MARCIA MCPHEE FAMILY FOUNDATION.

    e.  On or about September 30, 2016, MCPHEE filed and caused to be filed with the IRS a Form 1023-EZ on behalf of the TIMOTHY AND MARCIA MCPHEE FAMILY FOUNDATION seeking recognition of tax-exempt status

under Section 501(c)(3) of the Internal Revenue Code.

f.  On or about November 7, 2016, MCPHEE and PREDMORE signed a trust instrument that purported to create an irrevocable "Pure Trust Organization in Common Law" called MOUNTAIN SOLITUDE TRUST. The same day, MCPHEE also signed a second version of the trust instrument, titled "Banking Documents," which purported to create an "irrevocable trust" called MOUNTAIN SOLITUDE TRUST. MCPHEE and PREDMORE referred to MOUNTAIN SOLITUDE TRUST as a "business trust" and named themselves as trustees.

g.  On or about November 7, 2016, MCPHEE and PREDMORE signed a trust instrument that purported to create an irrevocable "Pure Trust Organization in Common Law" called MDH TRUST. The same day, MCPHEE also signed a second version of the trust instrument, titled "Banking Documents," which purported to create an "irrevocable trust" called MDH TRUST. MCPHEE and PREDMORE referred to MDH TRUST as a "business trust" and named themselves as trustees.

h.  On or about November 7, 2016, MCPHEE signed a trust instrument titled "Banking Documents," which purported to create an "irrevocable trust" called MDH FAMILY TRUST. MCPHEE and PREDMORE referred to MDH FAMILY TRUST as a "family trust" and named themselves as trustees.

i.  On or about November 7, 2016, MCPHEE and PREDMORE signed a trust instrument that purported to create an irrevocable "Pure Trust Organization in Common Law" called HER CHARITABLE TRUST. The same day,

MCPHEE also signed a second version of the trust instrument, titled "Banking Documents," which purported to create an "irrevocable trust" called HER CHARITABLE TRUST. MCPHEE and PREDMORE referred to HER CHARITABLE TRUST as a "charitable trust" and named themselves as trustees.

j.  On or about November 8, 2016, MCPHEE and PREDMORE opened an account for MDH FAMILY TRUST at Bank A, account number ******5338, for which MCPHEE and PREDMORE had sole signature authority.

k.  On or about November 8, 2016, MCPHEE and PREDMORE opened a bank account for the TIMOTHY AND MARCIA MCPHEE FAMILY FOUNDATION at Bank A, account number ******5350, for which MCPHEE and PREDMORE had sole signature authority.

l.  On or about November 16, 2016, MCPHEE and PREDMORE provided Bank A with a signed and notarized document titled "Certification of Trust" for the TIMOTHY AND MARCIA MCPHEE FAMILY FOUNDATION, which represented that MCPHEE and PREDMORE were the trustees of the TIMOTHY AND MARCIA MCPHEE FAMILY FOUNDATION.

m.  On or about November 16, 2016, MCPHEE and PREDMORE opened a bank account for HER CHARITABLE TRUST at Bank A, account number ******5422, for which MCPHEE and PREDMORE had sole signature authority.

n.  On or about November 17, 2016, MCPHEE and PREDMORE opened a bank account for MDH TRUST at Bank A, account number ******5434, for

which MCPHEE and PREDMORE had sole signature authority.

o.  On or about November 18, 2016, MCPHEE and PREDMORE opened a bank account for MOUNTAIN SOLITUDE TRUST at Bank A, account number ******5446, for which MCPHEE and PREDMORE had sole signature authority.

p.  On or about November 21, 2016, MCPHEE and PREDMORE provided Bank A with a signed and notarized document titled "Certification of Trust" for HER CHARITABLE TRUST, which represented that the "Grantor(s) or Settlor(s)" of HER CHARITABLE TRUST was MDH FAMILY TRUST.

q.  On or about November 21, 2016, MCPHEE and PREDMORE provided Bank A with a signed and notarized document titled "Certification of Trust" for MDH TRUST, which represented that the "Grantor(s) or Settlor(s)" of MDH TRUST was an individual with the initials G.R.

r.  On or about November 21, 2016, MCPHEE and PREDMORE provided Bank A with a signed and notarized document titled "Certification of Trust" for MOUNTAIN SOLITUDE TRUST, which represented that the "Grantor(s) or Settlor(s)" of MOUNTAIN SOLITUDE TRUST was an individual with the initials G.R.

s.  On or about January 1, 2017, PREDMORE purported to convey MCPHEE and PREDMORE's personal residence in Larimer County, Colorado by quitclaim deed to MDH FAMILY TRUST. MCPHEE and PREDMORE, however, maintained complete and beneficial use of the property after transferring title to MDH FAMILY TRUST.

t.  On or about October 15, 2019, MCPHEE filed and caused to be filed with the IRS a Form 1120-S on behalf of PROTECH for tax year 2016 that included a Schedule K-1 assigning 95% of PROTECH's ordinary business income for tax year 2016 to MDH TRUST. MCPHEE did so despite the fact that he and PREDMORE retained full dominion and control over the income assigned from PROTECH to MDH TRUST.

u.  On or about October 15, 2019, MCPHEE filed and caused to be filed with the IRS a Form 1065 on behalf of COMANCHE STREET PROPERTIES LLC for tax year 2016 that included a Schedule K-1 assigning 95% of COMANCHE STREET PROPERTIES LLC's ordinary business income for tax year 2016 to MOUNTAIN SOLITUDE TRUST. MCPHEE did so despite the fact that he and PREDMORE retained full dominion and control over the income assigned from COMANCHE STREET PROPERTIES LLC to MOUNTAIN SOLITUDE TRUST.

v.  On or about October 15, 2019, MCPHEE and PREDMORE filed and caused to be filed with the IRS a false and fraudulent joint Form 1040 for tax year 2016 that materially underreported MCPHEE and PREDMORE's total income for tax year 2016.

w.  On or about October 15, 2019, MCPHEE filed and caused to be filed with the IRS a false Form 1041 on behalf of MDH TRUST for tax year 2016 that fraudulently assigned to MDH TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2016.

x.  On or about October 15, 2019, PREDMORE filed and caused to be filed with the IRS a false Form 1041 on behalf of MOUNTAIN SOLITUDE TRUST for tax year 2016 that fraudulently assigned to MOUNTAIN SOLITUDE TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2016.

y.  On or about October 15, 2019, MCPHEE filed and caused to be filed with the IRS a false Form 1041 on behalf of MDH FAMILY TRUST for tax year 2016 that fraudulently assigned to MDH FAMILY TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2016.

z.  On or about October 15, 2019, MCPHEE filed and caused to be filed with the IRS a false Form 1041 on behalf of HER CHARITABLE TRUST for tax year 2016 that fraudulently assigned to HER CHARITABLE TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2016.

In violation of Title 26, United States Code, Section 7201.

## COUNT 11
### 26 U.S.C. § 7201
(Evasion of Assessment of Taxes for Tax Year 2017)

184.    The allegations set forth in paragraphs 1 through 48, 52 through 177, and 183 of this Indictment are re-alleged and incorporated as if set forth fully herein.

185.    From on or about February 23, 2016, through on or about October 15, 2019, in the District of Colorado and elsewhere, defendants TIMOTHY A. MCPHEE and MARCIA G. PREDMORE willfully attempted to evade and defeat a substantial amount of

income tax due and owing by them to the United States of America for tax year 2017 by committing at least one of the following affirmative acts of evasion, among others:

    a.  The acts described in paragraphs 75, 78, 79, 85, 86, 90, 94, 95, 97, 99, 100, 104, 106, 107, 110, 111, 117, 119, 131, 134, 141, 142, 164, and 168 of this Indictment.

    b.  The affirmative acts of evasion set forth in Count 10, paragraph 183.

    c.  From on or about April 1, 2017, through on or about December 31, 2017, MCPHEE and PREDMORE paid for personal expenses with funds held in the bank accounts for MDH FAMILY TRUST (account number ******5338) and MOUNTAIN SOLITUDE TRUST (account number ******5446).

    d.  On or about October 15, 2019, MCPHEE filed and caused to be filed with the IRS a Form 1120-S on behalf of PROTECH for tax year 2017 that included a Schedule K-1 assigning 95% of PROTECH's ordinary business income for tax year 2017 to MDH TRUST. MCPHEE did so despite the fact that he and PREDMORE retained full dominion and control over the income assigned from PROTECH to MDH TRUST.

    e.  On or about October 15, 2019, MCPHEE filed and caused to be filed with the IRS a Form 1065 on behalf of MDH LTD for tax year 2017 that included a Schedule K-1 assigning 90% of MDH LTD's ordinary business income for tax year 2017 to MDH TRUST. MCPHEE did so despite the fact that he and PREDMORE retained full dominion and control over the income assigned from MDH LTD to MDH TRUST.

    f.  On or about October 15, 2019, MCPHEE filed and caused to be filed with

the IRS a Form 1065 on behalf of COMANCHE STREET PROPERTIES LLC for tax year 2017 that included a Schedule K-1 assigning 95% of COMANCHE STREET PROPERTIES LLC's ordinary business income for tax year 2017 to MOUNTAIN SOLITUDE TRUST. MCPHEE did so despite the fact that he and PREDMORE retained full dominion and control over the income assigned from COMANCHE STREET PROPERTIES LLC to MOUNTAIN SOLITUDE TRUST.

g.  On or about October 15, 2019, PREDMORE filed and caused to be filed with the IRS a Form 1065 on behalf of MOUNTAIN SOLITUDE LLC for tax year 2017 that included a Schedule K-1 assigning 90% of MOUNTAIN SOLITUDE LLC's ordinary business income to MOUNTAIN SOLITUDE TRUST. PREDMORE did so despite the fact that she and MCPHEE retained full dominion and control over the income assigned from MOUNTAIN SOLITUDE LLC to MOUNTAIN SOLITUDE TRUST.

h.  On or about October 15, 2019, MCPHEE and PREDMORE filed and caused to be filed with the IRS a false and fraudulent joint Form 1040 for tax year 2017 that materially underreported MCPHEE and PREDMORE's total income for tax year 2017.

i.  On or about October 15, 2019, MCPHEE filed and caused to be filed with the IRS a false Form 1041 on behalf of MDH TRUST for tax year 2017 that fraudulently assigned to MDH TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2017.

j.   On or about October 15, 2019, PREDMORE filed and caused to be filed with the IRS a false Form 1041 on behalf of MOUNTAIN SOLITUDE TRUST for tax year 2017 that fraudulently assigned to MOUNTAIN SOLITUDE TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2017 and that fraudulently reported personal and other non-deductible expenses incurred by MCPHEE and PREDMORE individually during tax year 2017 as "Other Deductions" on Line 15a.

k.   On or about October 15, 2019, MCPHEE filed and caused to be filed with the IRS a false Form 1041 on behalf of MDH FAMILY TRUST for tax year 2017 that fraudulently assigned to MDH FAMILY TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2017 and that fraudulently reported personal and other non-deductible expenses incurred by MCPHEE and PREDMORE individually during tax year 2017 as "Other Deductions" on Line 15a.

l.   On or about October 15, 2019, MCPHEE filed and caused to be filed with the IRS a false Form 1041 on behalf of HER CHARITABLE TRUST for tax year 2017 that fraudulently and improperly assigned to HER CHARITABLE TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2017 and that fraudulently reported that HER CHARITABLE TRUST made $269,746 in charitable donations in 2017 when, in reality, HER CHARITABLE TRUST did not make charitable donations in that amount.

In violation of Title 26, United States Code, Section 7201.

## COUNT 12
### 26 U.S.C. § 7201
(Evasion of Assessment of Taxes for Tax Year 2018)

186.    The allegations set forth in paragraphs 1 through 48, 52 through 177, 183, and 185 of this Indictment are re-alleged and incorporated as if set forth fully herein.

187.    From on or about February 23, 2016, through on or about November 16, 2020, in the District of Colorado and elsewhere, defendants TIMOTHY A. MCPHEE and MARCIA G. PREDMORE willfully attempted to evade and defeat a substantial amount of income tax due and owing by them to the United States of America for tax year 2018 by committing at least one of the following affirmative acts of evasion, among others:

a.   The acts described in paragraphs 75, 78, 79, 85, 86, 90, 94, 95, 97, 99, 100, 104, 106, 107, 110, 111, 117, 119, 131, 134, 141, 142, 164, and 168 of this Indictment.

b.   The affirmative acts of evasion set forth in Count 10, paragraph 183 and Count 11, paragraph 185.

c.   From on or about January 1, 2018, through on or about December 31, 2018, MCPHEE and PREDMORE paid for personal expenses with funds held in the bank accounts for MDH FAMILY TRUST (account number ******5338) and MOUNTAIN SOLITUDE TRUST (account number ******5446).

d.   On or about October 14, 2019, MCPHEE filed and caused to be filed with the IRS a false Form 990-PF on behalf of the TIMOTHY AND MARCIA MCPHEE FAMILY FOUNDATION for tax year 2018 that falsely reported that the TIMOTHY AND MARCIA MCPHEE FAMILY FOUNDATION

received $1,152,550 in contributions, gifts, grants, etc. from HER CHARITABLE TRUST when in reality HER CHARITABLE TRUST did not make contributions in that amount to the TIMOTHY AND MARCIA MCPHEE FAMILY FOUNDATION during tax year 2018.

e.  On or about October 15, 2019, MCPHEE filed and caused to be filed with the IRS a Form 1065 on behalf of MDH LTD for tax year 2018 that included a Schedule K-1 assigning 90% of MDH LTD's ordinary business income for tax year 2018 to MDH TRUST. MCPHEE did so despite the fact that he and PREDMORE retained full dominion and control over the income assigned from MDH LTD to MDH TRUST.

f.  On or about October 15, 2019, MCPHEE filed and caused to be filed with the IRS a Form 1065 on behalf of COMANCHE STREET PROPERTIES LLC for tax year 2018 that included a Schedule K-1 assigning 95% of COMANCHE STREET PROPERTIES LLC's ordinary business income for tax year 2018 to MOUNTAIN SOLITUDE TRUST. MCPHEE did so despite the fact that he and PREDMORE retained full dominion and control over the income assigned from COMANCHE STREET PROPERTIES LLC to MOUNTAIN SOLITUDE TRUST.

g.  On or about October 15, 2019, PREDMORE filed and caused to be filed with the IRS a Form 1065 on behalf of MOUNTAIN SOLITUDE LLC for tax year 2018 that included a Schedule K-1 assigning 90% of MOUNTAIN SOLITUDE LLC's ordinary business income to MOUNTAIN SOLITUDE TRUST. PREDMORE did so despite the fact that she and MCPHEE

retained full dominion and control over the income assigned from MOUNTAIN SOLITUDE LLC to MOUNTAIN SOLITUDE TRUST.

h.  On or about October 15, 2019, MCPHEE and PREDMORE filed and caused to be filed with the IRS a false and fraudulent joint Form 1040 for tax year 2018 that materially underreported MCPHEE and PREDMORE's total income for tax year 2018.

i.  On or about October 15, 2019, MCPHEE filed and caused to be filed with the IRS a false Form 1041 on behalf of MDH TRUST for tax year 2018 that fraudulently and improperly assigned to MDH TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2018.

j.  On or about October 15, 2019, PREDMORE filed and caused to be filed with the IRS a false Form 1041 on behalf of MOUNTAIN SOLITUDE TRUST for tax year 2018 that fraudulently and improperly assigned to MOUNTAIN SOLITUDE TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2018 and that fraudulently reported personal and other non-deductible expenses incurred by MCPHEE and PREDMORE individually during tax year 2018 as "Other Deductions" on Line 15a.

k.  On or about October 15, 2019, MCPHEE filed and caused to be filed with the IRS a false Form 1041 on behalf of MDH FAMILY TRUST for tax year 2018 that fraudulently and improperly assigned to MDH FAMILY TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted

from individually during tax year 2018 and that fraudulently reported personal and other non-deductible expenses incurred by MCPHEE and PREDMORE individually during tax year 2018 as "Other Deductions" on Line 15a.

l.   On or about November 16, 2020, MCPHEE filed and caused to be filed with the IRS a false Amended Form 1041 on behalf of HER CHARITABLE TRUST for tax year 2018 that fraudulently and improperly assigned to HER CHARITABLE TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2018 and that fraudulently reported that HER CHARITABLE TRUST made $223,924 in charitable donations in 2018 when, in reality, HER CHARITABLE TRUST did not make charitable donations in that amount.

In violation of Title 26, United States Code, Section 7201.

## COUNT 13
### 26 U.S.C. § 7201
(Evasion of Assessment of Taxes for Tax Year 2019)

188.   The allegations set forth in paragraphs 1 through 49, 52 through 177, 183, 185 and 187 of this Indictment are re-alleged and incorporated as if set forth fully herein.

189.   From on or about February 23, 2016, through on or about October 15, 2020, in the District of Colorado and elsewhere, defendants TIMOTHY A. MCPHEE and MARCIA G. PREDMORE willfully attempted to evade and defeat a substantial amount of income tax due and owing by them to the United States of America for tax year 2019 by committing at least one of the following affirmative acts of evasion, among others:

a.   The acts described in paragraphs 75, 78, 79, 85, 86, 90, 94, 95, 97, 99, 100,

104, 106, 107, 110, 111, 117, 119, 131, 134, 141, 142, 164, and 168 of this Indictment.

b.  The affirmative acts of evasion set forth in Count 10, paragraph 183, Count 11, paragraph 185, and Count 12, paragraph 187.

c.  From on or about January 1, 2019, through on or about December 31, 2019, MCPHEE and PREDMORE paid for personal expenses with funds held in the bank accounts for MDH FAMILY TRUST (account number ******5338) and MOUNTAIN SOLITUDE TRUST (account number ******5446).

d.  On or about September 1, 2019, MCPHEE, acting as Manager of ASH RAYTOWN LLC, conveyed the Ash Street Property by quitclaim deed to MOUNTAIN SOLITUDE TRUST.

e.  On or about December 10, 2019, MCPHEE, acting as trustee of MOUNTAIN SOLITUDE TRUST, sold the Ash Street Property, and MCPHEE and PREDMORE caused, and assisted in causing, proceeds from the sale to be deposited into MOUNTAIN SOLITUDE TRUST's bank account (account number ******5446). Though MCPHEE purchased the Ash Street Property in or around March 2016 in his capacity as Manager of ASH RAYTOWN LLC, and though he controlled the property until its sale in December 2019, MCPHEE did not report the proceeds from the sale of the Ash Street Property on his and PREDMORE's joint Form 1040 for tax year 2019 and did not pay any income taxes on the profit from the sale.

f.  On or about September 15, 2020, MCPHEE filed and caused to be filed with the IRS a Form 1065 on behalf of COMANCHE STREET PROPERTIES

LLC for tax year 2019 that included a Schedule K-1 assigning 95% of COMANCHE STREET PROPERTIES LLC's ordinary business income for tax year 2019 to MOUNTAIN SOLITUDE TRUST. MCPHEE did so despite the fact that he and PREDMORE retained full dominion and control over the income assigned from COMANCHE STREET PROPERTIES LLC to MOUNTAIN SOLITUDE TRUST.

g.   On or about September 15, 2020, MCPHEE filed and caused to be filed with the IRS a Form 1065 on behalf of ASH RAYTOWN LLC for tax year 2019 that included a Schedule K-1 assigning 95% of ASH RAYTOWN LLC's ordinary business income for tax year 2019 to MOUNTAIN SOLITUDE TRUST. MCPHEE did so despite the fact that he and PREDMORE retained full dominion and control over the income assigned from ASH RAYTOWN LLC to MOUNTAIN SOLITUDE TRUST.

h.   On or about September 15, 2020, PREDMORE filed and caused to be filed with the IRS a Form 1065 on behalf of MOUNTAIN SOLITUDE LLC for tax year 2019 that included a Schedule K-1 assigning 90% of MOUNTAIN SOLITUDE LLC's ordinary business income to MOUNTAIN SOLITUDE TRUST. PREDMORE did so despite the fact that she and MCPHEE retained full dominion and control over the income assigned from MOUNTAIN SOLITUDE LLC to MOUNTAIN SOLITUDE TRUST.

i.   On or about October 15, 2020, MCPHEE and PREDMORE filed and caused to be filed with the IRS a false and fraudulent joint Form 1040 for tax year 2019 that materially underreported MCPHEE and PREDMORE's total

income for tax year 2019.

j.  On or about October 15, 2020, MCPHEE filed and caused to be filed with the IRS a false Form 1041 on behalf of MDH TRUST for tax year 2019 that fraudulently and improperly assigned to MDH TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2019.

k.  On or about October 15, 2020, PREDMORE filed and caused to be filed with the IRS a false Form 1041 on behalf of MOUNTAIN SOLITUDE TRUST for tax year 2019 that fraudulently and improperly assigned to MOUNTAIN SOLITUDE TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2019 and that fraudulently reported personal and other non-deductible expenses incurred by MCPHEE and PREDMORE individually during tax year 2019 as "Other Deductions" on Line 15a.

l.  On or about October 15, 2020, MCPHEE filed and caused to be filed with the IRS a false Form 1041 on behalf of MDH FAMILY TRUST for tax year 2019 that fraudulently and improperly assigned to MDH FAMILY TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2019 and that fraudulently reported personal and other non-deductible expenses incurred by MCPHEE and PREDMORE individually during tax year 2019 as "Other Deductions" on Line 15a.

m. On or about October 15, 2020, MCPHEE filed and caused to be filed with

the IRS a false Form 1041 on behalf of HER CHARITABLE TRUST for tax year 2019 that fraudulently and improperly assigned to HER CHARITABLE TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2019.

In violation of Title 26, United States Code, Section 7201.

## **COUNT 14**
**26 U.S.C. § 7201**
(Evasion of Assessment of Taxes for Tax Year 2020)

190.    The allegations set forth in paragraphs 1 through 48, 52 through 177, 183, 185, 187, and 189 of this Indictment are re-alleged and incorporated as if set forth fully herein.

191.    From on or about February 23, 2016, through on or about October 1, 2021, in the District of Colorado and elsewhere, defendants TIMOTHY A. MCPHEE and MARCIA G. PREDMORE willfully attempted to evade and defeat a substantial amount of income tax due and owing by them to the United States of America for tax year 2020 by committing at least one of the following affirmative acts of evasion, among others:

a.  The acts described in paragraphs 75, 78, 79, 85, 86, 90, 94, 95, 97, 99, 100, 104, 106, 107, 110, 111, 117, 119, 131, 134, 141, 142, 164, and 168 of this Indictment.

b.  The affirmative acts of evasion set forth in Count 10, paragraph 183, Count 11, paragraph 185, Count 12, paragraph 187, and Count 13, paragraph 189.

c.  From on or about January 1, 2020, through on or about December 31, 2020, MCPHEE and PREDMORE paid for personal expenses with funds held in the bank accounts for MDH FAMILY TRUST (account number ******5338)

and MOUNTAIN SOLITUDE TRUST (account number ******5446).

d.  From on or about March 30, 2020, through on or about December 23, 2020, MCPHEE directed income received in the form of commission payments from two entities with the initials H.G.C.U.K.L. and I.T.T.S.L. related to his involvement with a purported foreign investment firm into MDH FAMILY TRUST's bank account (account number ******5338).

e.  On or about March 19, 2021, MCPHEE filed and caused to be filed with the IRS a Form 1065 on behalf of COMANCHE STREET PROPERTIES LLC for tax year 2020 that included a Schedule K-1 assigning 95% of COMANCHE STREET PROPERTIES LLC's ordinary business income for tax year 2020 to MOUNTAIN SOLITUDE TRUST. MCPHEE did so despite the fact that he and PREDMORE retained full dominion and control over the income assigned from COMANCHE STREET PROPERTIES LLC to MOUNTAIN SOLITUDE TRUST.

f.  On or about March 19, 2021, PREDMORE filed and caused to be filed with the IRS a Form 1065 on behalf of MOUNTAIN SOLITUDE LLC for tax year 2020 that included a Schedule K-1 assigning 90% of MOUNTAIN SOLITUDE LLC's ordinary business income to MOUNTAIN SOLITUDE TRUST. PREDMORE did so despite the fact that she and MCPHEE retained full dominion and control over the income assigned from MOUNTAIN SOLITUDE LLC to MOUNTAIN SOLITUDE TRUST.

g.  On or about April 25, 2021, MCPHEE and PREDMORE filed and caused to be filed with the IRS a false and fraudulent joint Form 1040 for tax year 2020

that materially underreported MCPHEE and PREDMORE's total income for tax year 2020.

h.  On or about October 1, 2021, MCPHEE filed and caused to be filed with the IRS a false Form 1041 on behalf of MDH TRUST for tax year 2020 that fraudulently assigned to MDH TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2020 and that fraudulently reported personal and other non-deductible expenses incurred by MCPHEE and PREDMORE individually during tax year 2020 as "Other Deductions" on Line 15a.

i.  On or about October 1, 2021, PREDMORE filed and caused to be filed with the IRS a false Form 1041 on behalf of MOUNTAIN SOLITUDE TRUST for tax year 2020 that fraudulently and improperly assigned to MOUNTAIN SOLITUDE TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2020 and that fraudulently reported personal and other non-deductible expenses incurred by MCPHEE and PREDMORE individually during tax year 2020 as "Other Deductions" on Line 15a.

j.  On or about October 1, 2021, MCPHEE filed and caused to be filed with the IRS a false Form 1041 on behalf of MDH FAMILY TRUST for tax year 2020 that fraudulently and improperly assigned to MDH FAMILY TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2020 and that fraudulently reported personal and other non-deductible expenses incurred by MCPHEE and PREDMORE

individually during tax year 2020 as "Other Deductions" on Line 15a.

k.  On or about October 1, 2021, MCPHEE filed and caused to be filed with the IRS a false Form 1041 on behalf of HER CHARITABLE TRUST for tax year 2020 that fraudulently and improperly assigned to HER CHARITABLE TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2020 and that fraudulently reported that HER CHARITABLE TRUST made $70,271 in charitable donations in 2020 when, in reality, HER CHARITABLE TRUST did not make charitable donations in that amount.

In violation of Title 26, United States Code, Section 7201.

## COUNT 15
### 26 U.S.C. § 7201
(Evasion of Assessment of Taxes for Tax Year 2021)

192.    The allegations set forth in paragraphs 1 through 48, 52 through 177, 183, 185, 187, 189, 191 of this Indictment are re-alleged and incorporated as if set forth fully herein.

193.    From on or about February 23, 2016, through on or about October 3, 2022, in the District of Colorado and elsewhere, defendants TIMOTHY A. MCPHEE and MARCIA G. PREDMORE willfully attempted to evade and defeat a substantial amount of income tax due and owing by them to the United States of America for tax year 2021 by committing at least one of the following affirmative acts of evasion, among others:

a.  The acts described in paragraphs 75, 78, 79, 85, 86, 90, 94, 95, 97, 99, 100, 104, 106, 107, 110, 111, 117, 119, 131, 134, 141, 142, 164, and 168 of this Indictment.

b.  The affirmative acts of evasion set forth in Count 10, paragraph 183, Count 11, paragraph 185, Count 12, paragraph 187, Count 13, paragraph 189, and Count 14, paragraph 191.

c.  On or about September 1, 2019, MCPHEE, acting as Manager of COMANCHE STREET PROPERTIES LLC, conveyed the Comanche Street Property by quitclaim deed to MOUNTAIN SOLITUDE TRUST.

d.  From on or about January 1, 2021, through on or about December 31, 2021, MCPHEE and PREDMORE paid for personal expenses with funds held in the bank accounts for MDH FAMILY TRUST (account number ******5338) and MOUNTAIN SOLITUDE TRUST (account number ******5446).

e.  From on or about January 13, 2021, through on or about December 2, 2021, MCPHEE directed income received in the form of commission payments from an individual with the initials C.L. and from two entities with the initials I.T.T.S.L. and S.F.T. related to his involvement with a purported foreign investment firm into MDH FAMILY TRUST's bank account (account number ******5338).

f.  On or about December 22, 2021, MCPHEE, acting as trustee of MOUNTAIN SOLITUDE TRUST, caused MOUNTAIN SOLITUDE TRUST to sell the Comanche Street Property.

g.  On or about September 15, 2022, MCPHEE filed and caused to be filed with the IRS a Form 1065 on behalf of MOUNTAIN SOLITUDE LLC for tax year 2021 that included a Schedule K-1 assigning 90% of MOUNTAIN SOLITUDE LLC's ordinary business income to MOUNTAIN SOLITUDE

TRUST. MCPHEE did so despite the fact that he and PREDMORE retained full dominion and control over the income assigned from MOUNTAIN SOLITUDE LLC to MOUNTAIN SOLITUDE TRUST.

h. On or about September 20, 2022, MCPHEE filed and caused to be filed with the IRS a Form 1065 on behalf of COMANCHE STREET PROPERTIES LLC for tax year 2021 that included a Schedule K-1 assigning 98% of COMANCHE STREET PROPERTIES LLC's ordinary business income for tax year 2021 to MDH TRUST. MCPHEE did so despite the fact that he and PREDMORE retained full dominion and control over the income assigned from COMANCHE STREET PROPERTIES LLC to MDH TRUST.

i. On or about September 30, 2022, MCPHEE filed and caused to be filed with the IRS a false Form 1041 on behalf of MDH TRUST for tax year 2021 that fraudulently and improperly assigned to MDH TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2021.

j. On or about September 30, 2022, PREDMORE filed and caused to be filed with the IRS a false Form 1041 on behalf of MOUNTAIN SOLITUDE TRUST for tax year 2021 that fraudulently and improperly assigned to MOUNTAIN SOLITUDE TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2021 and that fraudulently reported personal and other non-deductible expenses incurred by MCPHEE and PREDMORE individually during tax year 2021 as "Other Deductions" on Line 15a.

k.  On or about September 30, 2022, MCPHEE filed and caused to be filed with the IRS a false Form 1041 on behalf of MDH FAMILY TRUST for tax year 2021 that fraudulently and improperly assigned to MDH FAMILY TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2021 and that fraudulently reported personal and other non-deductible expenses incurred by MCPHEE and PREDMORE individually during tax year 2021 as "Other Deductions" on Line 15a.

l.  On or about September 30, 2022, MCPHEE filed and caused to be filed with the IRS a false Form 1041 on behalf of HER CHARITABLE TRUST for tax year 2021 that fraudulently and improperly assigned to HER CHARITABLE TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2021.

m.  On or about October 3, 2022, MCPHEE and PREDMORE filed and caused to be filed with the IRS a false and fraudulent joint Form 1040 for tax year 2021 that materially underreported MCPHEE and PREDMORE's total income for tax year 2021.

In violation of Title 26, United States Code, Section 7201.

A TRUE BILL:


Ink signature on file in Clerk's Office
FOREPERSON


DAVID A. HUBBERT
Deputy Assistant Attorney General
Department of Justice, Tax Division

s/ Amanda R. Scott
AMANDA R. SCOTT
Trial Attorney
Department of Justice, Tax Division
150 M St. NE
Washington, D.C. 20002
(202) 514-5384
Amanda.R.Scott@usdoj.gov


s/ Lauren K. Pope
LAUREN K. POPE
Trial Attorney
Department of Justice, Tax Division
150 M St. NE
Washington, D.C. 20002
(202) 746-9068
Lauren.K.Pope@usdoj.gov


COREY J. SMITH
Senior Litigation Counsel
Department of Justice, Tax Division
150 M St. NE
Washington, D.C. 20002
(202) 514-5230
Corey.Smith@usdoj.gov

*Attorneys for the United States*